Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL IX

| | | |
|---|---|---|
| MARÍA E. COLÓN Y LA SUCESIÓN DE ALEJANDRO SALGADO COMPUESTA POR ALEJANDRO SALGADO SANTIAGO, ALEXANDRA SALGADO COLÓN Y ALEJANDRO EDUARDO SALGADO COLÓN | | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Guayama |
| Apelantes | KLAN202400759 | Caso Núm.: GM2022CV00128 |
| v. | | |
| WALMART PUERTO RICO, INC. | | Sobre: Despido injustificado; Discrimen por edad |
| Apelada | | |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Marrero Guerrero y el Juez Campos Pérez.

Marrero Guerrero, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 30 de septiembre de 2024.

Comparecieron ante nos la señora María E. Colón (señora Colón) y la Sucesión de Alejandro Salgado compuesta por el señor Alejandro Salgado Santiago, la señora Alexandra Salgado Colón y el señor Alejandro Eduardo Salgado Colón (familia Salgado-Colón o parte apelante) y nos solicitaron revocar una *Sentencia Sumaria* emitida el 18 de junio de 2024 por el Tribunal de Primera Instancia, Sala Superior de Guayama (TPI o Foro Primario).[1] Mediante el referido dictamen, el Foro Primario declaró No Ha Lugar la *Querella* interpuesta por la señora Colón y su esposo Alejandro Salgado contra Walmart Puerto Rico, Inc. (Walmart o parte apelada). El TPI concluyó que existió una razón legítima no discriminatoria para despedir a la

---

[1] Alegato del *Escrito de Apelación,* Anejo 28, pág. 549-558. Archivada y notificada en autos el 20 de junio de 2024. El 8 de julio de 2023, la parte apelante solicitó reconsideración y determinaciones de hechos adicionales, la cual fue declarada No Ha Lugar mediante una Resolución emitida el 15 de julio de 2023.

señora Colón por su incumplimiento con los procedimientos y las políticas de la parte apelada, así como por abandonar su empleo.

Tras evaluar el expediente ante nuestra consideración, se adelanta la revocación del dictamen apelado.

Veamos el trasfondo fáctico y procesal atinente a este recurso.

**I.**

El caso ante nuestra consideración tuvo su génesis el 1 de marzo de 2022, cuando la señora Colón y su esposo, el señor Alejandro Salgado Rivera, presentaron una *Querella* contra Walmart por despido injustificado,[2] reposición en el empleo, y recobro de pago atrasado por despido discriminatorio motivado por edad[3] al amparo del procedimiento sumario dispuesto en la Ley Núm. 2 de 17 de octubre de 1961, según enmendada, conocida como *Ley sumaria de reclamaciones laborales* (Ley Núm. 2).[4] En esencia, se alegó que la señora Colón trabajó en Walmart durante veintisiete (27) años, a partir de octubre de 1993, ocupando varios puestos en los que recibió evaluaciones satisfactorias por su ejecutoria. Además, se sostuvo que durante los catorce (14) años que la señora Colón se desempeñó como Asistente de Gerente en Walmart, rotó en los turnos de 7:00 a.m. a 5:00 p.m. y de 2:00 p.m. a 12:00 a.m. Se puntualizó que nunca se requirió que la señora Colón rotara en un horario distinto hasta que en la tienda Walmart de Guayama se le exigió trabajar en el turno de 10:00 p.m. a 9:00 a.m. Se adujo que la señora Colón le comunicó a la parte apelada que no estaba dispuesta a trabajar en el turno nocturno, ya que en dicho horario necesitaba atender cualquier emergencia de salud de su esposo. Se subrayó que, en respuesta, Walmart le ofreció un puesto de cajera a tiempo parcial con un salario inferior, causándole gran indignación. Asimismo, que la parte

---

[2] Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como Ley sobre despidos injustificados, 29 LPRA sec. 185a *et seq.* (Ley Núm. 80).
[3] Ley Núm. 100 de 30 de junio de 2019, según enmendada, conocida como Ley contra el discrimen en el empleo, 29 LPRA sec. 146 *et seq.* (Ley Núm. 100).
[4] *Íd.*, Anejo 1, págs. 1-8.

apelada le exigió trabajar en el turno nocturno para retener su empleo, ante el motivo de que el puesto de Asistente de Gerente requería disponibilidad del empleado en el turno nocturno. Se arguyó que el 17 de mayo de 2021, la parte apelada despidió a la señora Colón sin justa causa, por razones discriminatorias basadas en su edad por ser una persona de setenta y tres (73) años que ganaba el sueldo más alto. Se señaló que históricamente Walmart asignaba los turnos de los Asistentes de Gerente de forma arbitraria y caprichosa, constituyendo una conducta ilegal y discriminatoria a tenor con la Ley Núm. 100, *supra*. Se manifestó que, para la fecha del despido, la señora Colón sufrió una pérdida de su salario mensual de $4,967.00 y beneficios marginales, creando angustia y sufrimiento moral tanto para ella como para su esposo, valorado en $500,000.00 y $300,000.00, respectivamente. Por ello, se solicitó ordenar la reinstalación de la señora Colón en su empleo, el pago de los salarios atrasados y beneficios perdidos desde la fecha de su despido hasta la presentación de la acción judicial, la suma adicional de $4,697.00 por dicho concepto hasta la fecha de su reinstalación, el pago de la mesada, los daños morales sufridos por ambos, entre otras partidas.

Con la anuencia de la señora Colón y su esposo, el 27 de abril de 2022, el TPI declaró Ha Lugar la solicitud de Walmart de ventilar el caso mediante el procedimiento ordinario.[5]

Posteriormente, el 27 de julio de 2023, la señora Colón presentó una moción para informar el fallecimiento de su esposo y la sustitución de su parte por sus hijos, Alejandro Salgado Santiago, Alexandra Salgado Colón y Alejandro Eduardo Salgado Colón.[6] El 4 de agosto de 2023, el TPI declaró dicha solicitud Ha Lugar.[7]

---

[5] *Íd.*, Anejo 7, pág. 33. Archivada y notificada en autos el 3 de mayo de 2022.
[6] *Íd.*, Anejo 16, págs. 55-57.
[7] *Íd.*, Anejo 18, págs. 65. Archivada y notificada en autos el 7 de agosto de 2023.

Tras varios trámites procesales, el 18 de agosto de 2023, Walmart presentó una *Moción de sentencia sumaria*.[8] En esta, planteó que los únicos asuntos en controversia en este caso eran si la señora Colón estableció un caso *prima facie* de discrimen por edad a tenor con la Ley Núm. 100, *supra*, y si el despido de la señora Colón estaba justificado, de acuerdo con la Ley Núm. 80, *supra*. La parte apelada adujo que la señora Colón no presentó evidencia *prima facie* de discrimen por edad, toda vez que su única alegación era que, por la salud de su esposo y su edad, debía ser excusada de trabajar en el turno nocturno. Detalló que para la fecha del despido de la señora Colón, la tienda Walmart de Guayama contaba con nueve (9) Asistentes de Gerente que trabajaron o estaban trabajando en el turno nocturno. La parte apelada arguyó que el certificado médico presentado por la señora Colón acreditaba que estaba apta para trabajar sin restricción alguna. Walmart alegó que realizó múltiples intentos para lograr que la señora Colón se reintegrara a sus labores y advertirle que su acción de ausentarse por meses constituía abandono de empleo. Expuso que dicha ausencia afectó el ambiente de trabajo y el buen y normal funcionamiento de la empresa. Por ello, sostuvo que procedía la desestimación de la *Querella* en su contra, ya que el despido de la señora Colón se basó en criterios razonables y no arbitrarios ni caprichosos.

El 11 de octubre de 2023, la familia Salgado-Colón presentó su oposición a la solicitud de sentencia sumaria.[9] Mediante esta, se especificó que los siguientes hechos estaban en controversia:

> 13. La descripción del puesto de Asistente de Gerente de Walmart indica que se requiere que el incumbente "[t]rabaj[é] durante la noche y diversos turnos, según sea necesario".

> 17. Walmart tiene una política neutral de rotación de turnos que busca que todos los Asistentes de Gerentes trabajen turnos nocturnos dependiendo de las necesidades de la tienda donde trabajan para así distribuir la carga de ese turno entre todos ellos.

---

[8] *Íd.*, Anejo 20, págs. 95-121.
[9] *Íd.*, Anejo 23, págs. 469-486.

18. La tienda Walmart en Guayama tiene como práctica rotar el turno nocturno entre los Asistentes de Gerente cada 12 a 18 meses.

19. Al momento de rotar a los Asistentes de Gerentes de ese turno, Martínez, como Gerente de la tienda Walmart en Guayama, selecciona a aquellos que llevan más tiempo sin haber estado en ese turno.

22. La razón por que la demandante no trabajó el turno "overnight" en la tienda de Santa Isabel se debió a que esa tienda tenía varios Asistentes de Gerente que voluntariamente trabajaban el turno nocturno y hacían innecesaria una rotación, ello pues buscaban beneficiarse consistentemente del diferencial de salario que acompañaba dicha asignación.

27. Martínez también le indicó a Colón que considerara solicitar un cambio de posición a una que no tuviese que trabajar el turno nocturno, pero la demandante, luego de consultarlo con su familia, indicó que no estaba interesada en esa opción.

32. El 2 de febrero de 2021, la demandante proveyó un certificado médico indicando que podía regresar a su trabajo, "sin restricciones".

La parte apelante acentuó que la señora Colón fue despedida sin justa causa, ya que nunca se le requirió rotar en el turno nocturno durante los catorce (14) años que se desempeñó como Asistente de Gerente; la descripción de su puesto en el manual de empleado de Walmart no disponía el requisito de rotar en el turno nocturno y Walmart implementó una política arbitraria y caprichosa sobre la rotación de empleados. Esto, toda vez que no se aplicó la misma práctica de la tienda de Santa Isabel de cederle el turno nocturno a los empleados que se ofrecían a rotar voluntariamente, ya que una empleada de la tienda de Guayama estaba dispuesta a trabajar en el turno nocturno. A su vez, expuso que presentó evidencia indicativa del discrimen por edad, ya que era la Asistente de Gerente con mayor antigüedad, tenía setenta y tres (73) años de edad y era veinte (20) años mayor que el próximo empleado menor que ella.

El 17 de octubre de 2023, Walmart peticionó permiso para presentar una réplica a la oposición a la solicitud de sentencia

sumaria.[10] Sin embargo, el 20 de octubre de 2023, el Foro Primario emitió una *Orden* en la que no autorizó la réplica.[11]

Inconforme, la parte apelada presentó una *Moción en Reconsideración a Orden*.[12] En esta, Walmart expuso que necesitaba expresarse sobre una serie de hechos que la parte apelante alegó estar incontrovertidos en la oposición a la moción de sentencia sumaria, ya que entendió que eran alegaciones conclusorias que estaban basadas en especulaciones infundadas. Empero, el 3 de noviembre de 2023, el TPI emitió una *Orden* en la que declaró No Ha Lugar al petitorio de la parte apelada.[13]

El 18 de junio de 2024, el TPI emitió una *Sentencia Sumaria* en la que declaró No Ha Lugar a la *Querella* presentada por la familia Salgado-Colón.[14] El Foro Primario determinó que era menester concluir que Walmart estableció una razón legítima para despedir a la señora Colón por su incumplimiento con los procedimientos y políticas de la empresa y su abandono de empleo. Para ello, consignó los siguientes hechos esenciales y pertinentes como incontrovertibles:

1. Walmart tiene políticas establecidas que prohíben el discrimen en el empleo, sea por edad o por cualquier otra razón. […]

2. Walmart también tiene políticas establecidas sobre asistencia y puntualidad de sus empleados. […]

3. Las normas y políticas de la empresa están accesibles a todos sus empleados a través de la red intranet de Walmart conocida como "WIRE", y es obligación de todos los empleados de mantenerse informado sobre las políticas vigentes, nuevas y enmendadas, así como el contenido de las mismas. […]

4. Colón comenzó a trabajar como empleada por tiempo indeterminado con Walmart el 11 de octubre de 1993. […]

5. Durante su empleo, la demandante ocupó varios puestos, previo a ser nombrada Asistente de Gerente entre el año 2003 y 2004. […]

---

[10] Apéndice del *Alegato en Oposición a Apelación*, Anejo 1, págs. 1-3.
[11] *Íd.*, Anejo 2, págs. 4-5.
[12] *Íd.*, Anejo 3, págs. 6-10.
[13] *Íd.*, Anejo 4, págs. 11-12. Archivada y notificada en autos el 6 de noviembre de 2023.
[14] Apéndice del *Escrito de Apelación*, Anejo 28, págs. 529-548. Archivada y notificada en autos el 20 de junio de 2024.

6. Durante el entrenamiento para convertirse en Asistente de Gerente, Colón llenó un formulario que le preguntaba "1. Como gerencial nuevo, la primera asignación que tal vez se te ofrezca es el turno nocturno; ¿Tienes algún inconveniente o situación que no te permita comenzar haciendo este turno?" A lo que la demandante contestó "Ningún inconveniente con esto". [...]

7. Colón trabajó en varias tiendas de Walmart durante su empleo con la empresa y, durante julio de 2016, pasó a ser Asistente de Gerente de la tienda de Walmart en Santa Isabel a la tienda de Walmart en Guayama. [...]

8. Al momento de la demandante ser trasladada a la tienda de Walmart en Guayama, la Gerente era Sail Martínez. [...]

9. La tienda Walmart de Guayama tiene un horario de operación de 6:00 a.m. a 12:00 p.m. [...]

10. En términos generales, había tres (3) turnos en la tienda de Walmart en Guayama: el primer turno de 7:00 a.m. a 5:00 p.m.; el segundo turno de 2:00 p.m. a 12:00 a.m.; y el tercer turno de 10:00 p.m. a 8:00 a.m. [...]

11. Al grupo de tercer turno que corría de 10:00 p.m. a 8:00 a.m. se le conocía como el grupo del turno nocturno o turno "overnight". [...]

12. Durante el turno nocturno los Asistentes de Gerente están encargados, entre otras cosas, de reabastecer la tienda para que la misma esté en óptimas condiciones para los clientes al día siguiente. [...]

13. La descripción del puesto de Asistente de Gerente de Walmart indica que se requiere que el incumbente "[t]rabaj[e] durante la noche y diversos turnos, según sea necesario". [...]

14. Colón recibió el Manual del Asociado, el cual incluye las prácticas y políticas de recursos humanos para todos los empleados de la empresa en Puerto Rico. [...]

15. Durante su empleo con Walmart, Colón recibió adiestramientos sobre las políticas de la empresa sobre prohibición de discrimen y hostigamiento en el lugar de empleo. [...]

16. Colón también tenía conocimiento de dónde ver las versiones más recientes de las políticas de la empresa a través de WIRE. [...]

17. Walmart tiene una política neutral de rotación de turnos que busca que todos los Asistentes de Gerente trabajen turnos nocturnos dependiendo de las necesidades de la tienda donde trabajan para así distribuir la carga de ese turno entre todos ellos. [...]

18. La tienda de Walmart en Guayama tiene como práctica rotar el turno nocturno entre los Asistentes de Gerente cada 12 a 18 meses. [...]

19. Al momento de rotar a los Asistentes de Gerente de ese turno, Martínez, como Gerente de la tienda Walmart en Guayama, selecciona a aquellos que llevan más tiempo sin haber estado en ese turno.

20. La rotación al turno de "overnight" es algo que se les notifica a los Asistentes de Gerentes con anticipación a la fecha de comienzo de dicha rotación para que vayan preparando sus asuntos. [...]

21. Durante el tiempo en que la demandante se desempeñó como Asistente de Gerente en la tienda de Walmart en Santa Isabel, la demandante no trabajó el turno de "overnight". [...]

22. La razón principal por que la demandante no trabajó el turno "overnight" en la tienda de Santa Isabel se debió a que esa tienda tenía varios Asistentes de Gerente que voluntariamente trabajaban el turno nocturno y hacían innecesaria una rotación, ello pues buscaban beneficiarse consistentemente del diferencial de salario que acompañaba dicha asignación. [...]

23. Desde que la demandante llegó a la tienda de Walmart en Guayama, Martínez le explicó en reiteradas ocasiones que la disponibilidad para trabajar turnos nocturnos y rotativos era un requisito de la posición de Asistente de Gerente, y que en la medida que la situación relacionada a los voluntarios para el turno nocturno cambiara o las necesidades operacionales así lo requieran, era un requisito de su posición cumplir con dichos turnos asignados. [...]

24. El 15 de abril de 2019, Martínez le notificó a la demandante que sería asignada al turno nocturno. [...]

25. Posteriormente, Colón solicitó un acomodo para no trabajar el turno nocturno por sus alegadas condiciones de salud, el cual fue rechazado el 19 de junio de 2019 y notificado a la demandante el 5 de julio de 2019, debido a que "An [A]ssistant Manager is required to be able to work during the night and in different shifts, as necessary". [...]

26. En ese momento, Martínez le informó a Colón que tenía cubierta para los turnos nocturnos necesarios, por lo que no se le exigió que se reportara al turno nocturno, pero se le recalcó que tendría que cubrir el turno nocturno en el futuro al igual que todos los Asistentes de Gerente. [...]

27. Martínez también le indicó a Colón que considerara solicitar un cambio de posición a una que no tuviese que trabajar el turno nocturno, pero la demandante, luego de consultarlo con su familia, indicó que no estaba interesada en esa opción. [...]

28. Para el año 2020, la tienda de Walmart en Guayama comenzó a requerir más Asistentes de Gerente para el turno nocturno con el propósito de que la tienda estuviese reabastecida antes de que se empezara a recibir público y, desde ese entonces, la tienda opera con tres (3) Asistentes de Gerente en el turno nocturno. [...]

29. El 18 de julio de 2020, Martínez le volvió a informar a Colón que estaría siendo asignada al turno nocturno, comenzando el 1 de septiembre de 2020. [...]

30. Durante el mes de agosto de 2020, la demandante nuevamente solicitó acomodo por su alegada condición de salud, el cual no fue aprobado, según se le informó el 23 de septiembre de 2020. [...]

31. Posteriormente, Colón se acogió a una licencia médica sin sueldo. […]

32. El 2 de febrero de 2021, la demandante proveyó un certificado médico indicando que podía regresar a su trabajo, "sin restricciones". […]

33. Estando capacitada para trabajar como Asistente de Gerente sin restricciones, Colón fue informada que sería asignada al turno nocturno. […]

34. El 6 de marzo de 2021, Martínez se reunió con Colón para preguntarle cuándo se reportaría a trabajar a su turno nocturno, pero la demandante indicó que no se sentía que podía trabajar el turno nocturno ya que "tengo 73 años y mi esposo y yo estamos solitos… yo consulto y te dejo saber". […]

35. El 12 de marzo de 2021, Colón se comunicó con la tienda para indicar que consultó la posibilidad de trabajar el turno nocturno con su esposo, pero decidió no trabajar ese turno porque no quería dejarlo solo. […]

36. El 15 de marzo de 2021, Martínez se reunió con Colón y le explicó nuevamente que la posición de Asistente de Gerente requería que trabajara el turno nocturno y Colón volvió a repetirle que no se reportaría a trabajar porque no trabajaría ese turno. […]

37. Durante esa reunión, Colón indicó que no iba a trabajar el turno nocturno, y que la compañía hiciera lo que tuviera que hacer porque tampoco iba a renunciar. […]

38. Colón expresó no poder trabajar el turno nocturno por razón del estado de salud de su esposo y no por su edad o alguna condición particular de ella. […]

39. Durante esa reunión, Colón fue apercibida de que, si no se reportaba a trabajar para el turno asignado, podría ser despedida. […]

40. El 19 de marzo de 2021, la empresa le envió una carta a la demandante resaltando que se encontraba ausente sin estar cubierta por licencia alguna y que debía comunicarse a los tres (3) días del recibo de dicha carta para discutir su regreso al trabajo o se estaría dando por terminado su empleo por abandono. […]

41. El 26 de marzo de 2021, la empresa le envió otra carta a la demandante indicándole lo siguiente: "Al presente, usted no se ha reportado a su turno, ni se ha comunicado con su supervisor, ni h[a] entregado documentación que excuse sus ausencias, lo cual es considerado un abandono de empleo. De tener documentación que justifique sus ausencias deberá presentarla a su Gerente General o Gerente de Recursos Humanos para que dicha documentación pueda ser evaluada y poder tomar una determinación en torno a su caso. De tener documentación que justifique sus ausencias deberá entregarlas en o antes del 1 de abril de 2021". […]

42. El 31 de marzo de 2021, la demandante le envió una carta a la empresa indicando que "Walmart discrimina contra mí al insistir que trabaje un turno que me requiere estar fuera de mi hogar durante la madrugada" y que "[r]eiteradamente le he indicado que, debido a las

condiciones de salud de mi esposo, necesito estar en mi hogar durante la madrugada". [...]

43. El 21 de abril de 2021, Walmart le respondió a Colón, indicándole nuevamente que era requisito esencial del puesto de Asistente de Gerente poder trabajar turnos nocturnos de forma rotativa, pues de esa manera se comparte la responsabilidad de cubrir ese turno equitativamente entre todos los Asistentes de Gerente. [...]

44. Como Colón mencionó en su carta del 31 de marzo de 2021 que no podía trabajar el turno nocturno debido a las condiciones de salud de su esposo, Walmart le indicó a ella en la comunicación del 21 de abril de 2021 que, a pesar de no tener la información necesaria para hacer una determinación sobre si una licencia médico-familiar le aplicaba bajo el Family and Medical Leave Act ("FMLA"), esta licencia no le aplicaría porque ella no contaba con las 1,250 horas trabajadas durante los 12 meses que preceden el comienzo de dicha licencia. [...]

45. En esa misma comunicación y como alternativa para atender la situación, Walmart le ofreció a Colón una posición de Cajera a tiempo parcial, posición que no tenía como requisito esencial del puesto trabajar turnos nocturnos. [...]

46. A Colón se le indicó que debía informar sobre si se iba a reportar a trabajar al turno nocturno como Asistente de Gerente o, en la alternativa, si iba a aceptar el puesto de Cajera, en o antes del 30 de abril de 2021, fecha que fue prorrogada hasta el 17 de mayo de 2021. [...]

47. El 20 de mayo de 2021, Walmart le envió una carta a Colón indicándole que se estaba dando por terminado su empleo ya que "[a]l presente, usted no se ha reportado al turno, no se ha comunicado con su supervisor, ni ha entregado documentación que excuse sus ausencias lo que es considerado un abandono de empleo". [...]

48. Para la fecha del despido de la demandante, la tienda de Walmart en Guayama contaba con otros nueve (9) Asistentes de Gerente y todos, excepto Luis Santiago, quien se fue de la tienda un poco después de la demandante, habían trabajado el turno nocturno o lo estaban trabajando en ese momento [...]

No conforme, el 8 de julio de 2024, la familia Salgado-Colón presentó una *Solicitud de determinaciones de hechos adicionales y moción de reconsideración al amparo de las Reglas 43 y 47 de las de Procedimiento Civil.*[15] En esta, indicó que en el párrafo 22 el TPI reconoció que la política de rotar era innecesaria cuando existían empleados que voluntariamente estaban dispuestos a trabajar en el turno nocturno, siendo contradictorio con la conclusión del TPI en que Walmart estableció una razón no discriminatoria para justificar

---

[15] *Íd.*, Anejo 29, págs. 549-558.

el despido. La parte apelante concretó que se demostró que había una empleada que voluntariamente estaba dispuesta a trabajar en el turno nocturno. Asimismo, enunció que el despido de la señora Colón fue injustificado, en vista de que nunca se negó a continuar trabajando; se le requirió rotar al turno nocturno cuando no era un requisito del puesto, y había otra empleada de la tienda dispuesta a trabajar en el referido turno. A su vez, sostuvo que la señora Colón estaba protegida por la Ley Núm. 100, *supra,* por ser una persona mayor de setenta y tres (73) años. La familia Salgado-Colón le solicitó al TPI enmendar la demanda para añadir los siguientes hechos a los que la parte apelada no se opuso:

1. La querellante María E. Colón nació el 18 de diciembre de 1947 (12/18/1947). […] Esto significa que a la fecha de su despido (17 de mayo de 2021) tenía 73 años de edad.

2. A la fecha de su despido la querellante Colón ocupaba el puesto de Asistente de Gerente, en el que se había desempeñado por 14 años. […]

3. Para la fecha de su despido[,] la querellante María E. Colón era la Asistente de Gerente de mayor edad que trabajaba en la tienda Walmart de Guayama. […]

4. Para la fecha de su despido[,] la querellante María E. Colón era la Asistente de Gerente de mayor antigüedad, conjuntamente con otro empleado que comenzó en la misma fecha que la querellante, que trabajaba en la tienda Walmart de Guayama. […]

5. Para la fecha de su despido[,] la querellante María E. Colón devengaba un salario bruto de $51,582.70 anual que era el tercer salario más alto entre los diez (10) Asistentes de Gerente que trabajaban en la tienda Walmart de Guayama. […]

6. Mientras fue Asistente de Gerente en las tiendas Walmart antes del 2019, a la querellante no se le solicitó que trabajara el turno "overnight". […]

7. El turno "overnight" era de 10:00 p.m. a 8:00 a.m. […]

8. Los Asistentes de Gerente no rotaron, "porque si fueran a rotar me hubieran rotado a mi [María E. Colón] con, con mucha anterioridad porque tanto tiempo en la compañía." […]

9. La querellante María E. Colón no se negó a trabajar. […]

10. La querellante María E. Colón estuvo dispuesta a trabajar durante los tres (3) turnos diurnos y así se lo comunicó a la oficina de Recursos Humanos de la tienda. […]

11. Para marzo de 2021 había otra Asistente de Gerente en la tienda de Guayama que estaba dispuesta a trabajar el turno nocturno ("overnight") que le habían asignado a la querellante. [...]

No obstante, el 15 de julio de 2024, el Foro Primario emitió y notificó una *Resolución* en la que declaró No Ha Lugar a la reconsideración de la parte apelante.[16]

Ante su inconformidad con la determinación del TPI, 12 de agosto de 2024, la parte apelante presentó el recurso de apelación que nos ocupa, en el que le atribuyó al Foro Primario la comisión de los siguientes errores:

> **PRIMER ERROR:** ERRÓ EL TPI AL DICTAR SENTENCIA SUMARIA Y DETERMINAR QUE WALMART ADELANTÓ UNA RAZÓN NO DISCRIMINATORIA PARA JUSTIFICAR EL DESPIDO DE LA APELANTE PORQUE, 1) LA SUPUESTA "POLÍTICA DE ROTAR" DE WALMART NO ESTÁ ESTABLECIDA EN NINGÚN DOCUMENTO O REGLAMENTO DE LA APELADA; 2) PORQUE EN LOS 14 AÑOS QUE LA APELANTE OCUPÓ EL PUESTO DE ASISTENTE DE GERENTE NUNCA SE LE HABÍA EXIGIDO ROTAR POR CUYA RAZÓN DE HABER EXISTIDO UNA SUPUESTA "POLÍTICA DE ROTAR", LA MISMA ESTABA EN DESUSO O ERA INOFICIOSA Y, 3) PORQUE DE HABER EXISTIDO UNA SUPUESTA "POLÍTICA DE ROTAR", WALMART LA APLICÓ CONTRA LA APELANTE DE FORMA ARBITRARIA, CAPRICHOSA E INCONSISTENTE.

> **SEGUNDO ERROR:** ERRÓ EL TPI AL DECLARAR NO HA LUGAR A LA SOLICITUD DE DETERMINACIÓN DE HECHOS ADICIONALES Y AL NEGARSE A CONSIDERAR LOS HECHOS ADICIONALES NO CONTROVERTIDOS INCLUIDOS EN LA OPOSICIÓN A LA MOCIÓN DE SENTENCIA SUMARIA POR CUANTO DICHOS HECHOS ADICIONALES ESTABLECEN QUE EXISTE UNA CONTROVERSIA MATERIAL QUE IMPEDÍA QUE EL TPI DICTARA SENTENCIA SUMARIA A FAVOR DE WALMART.

En atención a los errores planteados por la apelante, pormenorizamos la normativa jurídica pertinente a este recurso.

## II.

### A. Sentencia sumaria

La sentencia sumaria es un mecanismo procesal que permite que un caso se disponga ágilmente, sin la celebración de un juicio, siempre que no se presenten controversias genuinas de hechos

---

[16] *Íd.*, Anejo 30, pág. 559.

materiales. *Birriel Colón v. Econo y otro*, 2023 TSPR 120, 213 DPR ___ (2023); *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964, 979 (2022); *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 334 (2021). A esos efectos, un hecho material es uno esencial y pertinente, que puede afectar el resultado de la reclamación conforme al derecho sustantivo aplicable. *Banco Popular v. Posada*, 2024 TSPR 62, 213 DPR ___ (2024); *Ramos Pérez v. Univisión*, 178 DPR 200, 213 (2010); véase, además, Regla 36.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.1. Además, la controversia sobre el hecho material debe ser real. *Ramos Pérez v. Univisión, supra.* En otras palabras, debe ser "de una calidad suficiente como para que sea necesario que un juez dirima a través de un juicio plenario . . .". *Íd.*

Cónsono con lo anterior, la Regla 36.3(e) de Procedimiento Civil, *supra*, R. 36.3 (e), establece que procede dictar una moción de sentencia sumaria "si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente. . .". Véase, además, *Birriel Colón v. Econo y otro, supra*; *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109 (2015); *SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414, 430 (2013).

Por otra parte, la parte que se opone a la solicitud de sentencia sumaria deberá refutar los hechos materiales que entienda están en disputa con evidencia sustancial. *Birriel Colón v. Supermercado Los Colobos, supra*; *SLG Fernández-Bernal v. RAD-MAN et al., supra*, págs. 336-337. Ahora bien, si la petición de sentencia sumaria está sustentada con declaraciones juradas u otra prueba, la parte que se opone no puede descansar en meras alegaciones, sino que deberá contestar de una forma tan detallada y específica como lo haya hecho la parte promovente. *Birriel Colón v. Econo y otro, supra*; *Ramos Pérez v. Univisión, supra*, pág. 215; Regla 36.3 (c) de Procedimiento Civil,

*supra*, R. 36.3 (c). De lo anterior, incluso si no se presenta prueba para controvertir la evidencia presentada, ello no conduce a la concesión automática de una solicitud de sentencia sumaria. *Birriel Colón v. Econo y otro, supra*; *SLG Fernández-Bernal v. RAD-MAN et al., supra*, pág. 337.

Respecto a la oposición a una solicitud de sentencia sumaria, se sostiene, además que, la Regla 36.3 (b) de Procedimiento Civil, *supra*, R. 36.3 (b), establece que, "[l]a contestación a la moción de sentencia sumaria deberá ser presentada dentro del término de veinte (20) días de su notificación. . .". Por ello, "[s]i la parte contraria no presenta la contestación a la sentencia sumaria en el término provisto en esta regla, se entenderá que la moción de sentencia sumaria queda sometida para la consideración del tribunal". *Íd.*

Nuestro más alto foro estableció en *Meléndez González et al. v. M. Cuebas, supra*, el estándar específico que este Tribunal de Apelaciones debe seguir al revisar denegatorias o concesiones de solicitudes de sentencia sumaria.

Primero, nos encontramos en la misma posición que el foro primario al momento de revisar las mociones de sentencia sumaria. *Íd.*, pág. 118. En otras palabras, se aplicarán los mismos criterios que la Regla 36 de Procedimiento Civil, *supra*, R. 36, le exige al foro *a quo*. Así pues, este Tribunal está llamado a llevar a cabo una revisión *de novo*. Sin embargo, no podemos considerar evidencia que las partes no presentaron ante el TPI, y debemos examinar el expediente de la forma más favorable hacia la parte opositora de la moción de sentencia sumaria, realizando todas las inferencias permisibles a su favor. *Meléndez González et al. v. M. Cuebas, supra*, pág. 116.

Segundo, al encontrarnos en la misma posición que el foro *a quo*, debemos revisar que tanto la petición de sentencia sumaria como su oposición cumplan con los requisitos de la Regla 36 de Procedimiento Civil, *supra*, y los discutidos en el caso de *SLG Zapata-*

*Rivera v. J.F. Montalvo, supra; Meléndez González et al. v. M. Cuebas, supra,* pág. 118.

Tercero, nuestro Tribunal debe revisar si en realidad existen hechos materiales en controversia. *Íd.* De haberlos, debemos cumplir con la exigencia establecida en la Regla 36.4 de Procedimiento Civil, *supra,* R. 36.4, y exponer cuáles son los hechos materiales que están en controversia y cuáles son incontrovertidos. *Meléndez González et al. v. M. Cuebas, supra.*

Cuarto y último, si este Tribunal determina que no existen hechos materiales en controversia, entonces procederemos a revisar si el TPI aplicó correctamente el derecho. *Íd.,* pág. 119.

### B. Despido injustificado

En términos generales, el despido es la ruptura unilateral que hace un patrono del contrato de trabajo celebrado con un empleado. *Díaz v. Wyndham Hotel Corp.,* 155 DPR 364, 374 (2001). Ahora bien, para efectos de la Ley Núm. 80, *supra,* se entenderá por despido lo siguiente:

> además de la cesantía del empleado, su suspensión indefinida o por un término que exceda de tres (3) meses, excepto en el caso de empleados de industria y negocios estacionales, o la renuncia del empleo motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra. Artículo 5 de la Ley Núm. 80, *supra,* sec. 185e.

El Estado tiene un interés apremiante en regular las relaciones obrero-patronales con el fin de evitar prácticas injustas de trabajo e implementar una clara política pública de proteger los derechos de los empleados. *Íd.* Así, pues, la Ley Núm. 80, *supra,* tiene el propósito de desalentar los despidos injustificados y las actuaciones arbitrarias contra los empleados mediante la imposición de remedios económicos. *Ruiz Mattei v. Commercial Equip. Fin., Inc.,* 2024 TSPR 68; *González Santiago v. Baxter Healthcare,* 202 DPR 281, 291 (2019). En dicha legislación se incorporó el estándar de justa causa como

limitación a todo despido. *Díaz v. Wyndham Hotel Corp., supra,* págs. 374-375. Es decir, no existe una prohibición absoluta en contra del despido, ya que el patrono puede plantear la defensa de justa causa. *Íd.*; *Rodríguez Gómez v. Multinational Ins.*, 207 DPR 540, 549 (2021); *Romero et als. v. Cabrer Roig et als.*, 191 DPR 643, 651 (2014). A tenor con el Artículo 2 de la Ley Núm. 80, *supra,* sec. 185b, los criterios que constituyen justa causa para el despido son los siguientes:

> Se entenderá por justa causa para el despido de un empleado aquella que no esté motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. Además, se entenderá por justa causa aquellas razones que afecten el buen y normal funcionamiento de un establecimiento que incluyen, entre otras, las siguientes:
>
> (a) Que el empleado incurra en un patrón de conducta impropia o desordenada.
>
> (b) Que el empleado incurra en un patrón de desempeño deficiente, ineficiente, insatisfactorio, pobre, tardío o negligente. Esto incluye incumplir con normas y estándares de calidad y seguridad del patrono, baja productividad, falta de competencia o habilidad para realizar el trabajo a niveles razonables requeridos por el patrono y quejas repetidas de los clientes del patrono.
>
> (c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidos para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.
>
> (d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.
>
> (e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.
>
> (f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento.
>
> No se considerará justa causa para el despido de un empleado la colaboración o expresiones hechas por éste, relacionadas con el negocio de su patrono, en una investigación ante cualquier foro administrativo, judicial o legislativo en Puerto Rico, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada según la ley. En este último caso, el empleado así despedido tendrá derecho, además de cualquier otra adjudicación que correspondiere, a que se ordene su

inmediata restitución en el empleo y a que se le compense por una cantidad igual a los salarios y beneficios dejados de percibir desde la fecha del despido hasta que un tribunal ordene la reposición en el empleo.

De esta forma, la ausencia de razonabilidad en las exigencias de conducta de los empleados puede convertir el despido en uno caprichoso o arbitrario. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 772 (2022), *citando a* R.N. Delgado Zayas, *Apuntes para el estudio de la legislación protectora del trabajo en el derecho laboral puertorriqueño*, San Juan, rev. 2005, pág. 120. Pues, aunque un patrono tiene el derecho de fijar requisitos para un puesto, así como los niveles mínimos de desempeño, dichas exigencias deben guardar una relación directa con las funciones del puesto y los niveles de desempeño deben ser razonables. *Íd.*, *citando a* A. Acevedo Colom, *Legislación protectora del trabajo comentada*, 8va ed., San Juan, Ed. Ramallo Printing Bros, 2005, pág. 145.

En tal sentido, el Artículo 1 de la Ley Núm. 80, *supra*, sec. 185a, establece que todo empleado que trabaje mediante remuneración, contratado sin tiempo determinado y que fuere despedido sin que haya mediado justa causa tendrá derecho a recibir una indemnización o mesada por el tiempo trabajado para el patrono. *Ortiz Ortiz v. Medtronic, supra*, pág. 771; *Rodríguez Gómez v. Multinational Ins., supra*, págs. 549-550. Una vez el empleado presenta prueba demostrativa de los antes mencionados requisitos, se activa una presunción controvertible de despido injustificado. *Rodríguez Gómez v. Multinational Ins., supra*, pág. 550; *Rivera Figueroa v. The Fuller Brush. Co.*, 180 DPR 894, 911-912 (2011). Por ello, el patrono tiene el deber de alegar en la contestación de la demanda, los hechos que dieron origen al despido y que el mismo estuvo justificado. *Romero et als. v. Cabrer Roig et als., supra.*

**C. Discrimen por edad en el empleo**

La Ley Núm. 100, *supra*, tiene el propósito de proteger a los empleados contra el discrimen en la relación de empleo e imponer responsabilidad civil por los daños causados. *Ruiz Mattei v. Commercial Equip. Fin., Inc.*, *supra*; *Segarra Rivera v. Int'l Shipping et al.*, 208 DPR 964 (2022); *García Pagán v. Shirley Caribbean*, 122 DPR 193, 211 (1988). Dicha legislación correspondió a la indeseable práctica de los patronos discriminar contra los empleados por razón de su edad, raza, color, sexo, origen social o nacional, condición social, ideas políticas o religiosas. *Jusino et als. v. Walgreens*, 155 DPR 560, 574 (2011). El Artículo 3 de la Ley Núm. 100, *supra*, sec. 148, establece una presunción controvertible de discrimen favorable al empleado. En tal sentido, le corresponde al patrono probar que la razón del despido no fue discriminatoria. *Íd.*

No todo despido injustificado es discriminatorio, sin embargo, todo despido discriminatorio es injustificado. *Díaz v. Wyndham Hotel Corp., supra*, pág. 387; *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 211 (2021). Por dicha razón, cuando se alegue despido discriminatorio por edad, la parte demandante debe demostrar que (i) pertenece a una clase prohibido por el estatuto, su edad; o (ii) estaba cualificada para ejercer el puesto que ocupaba; o (iii) fue despedida, o (iv) fue sustituida por una persona más joven. *Íd.*, págs. 380-390; *Segarra Rivera v. Int'l Shipping et al., supra*, págs. 989-990.

Importante es que no se favorece el mecanismo de sentencia sumaria en una reclamación de discrimen al amparo de la Ley Núm. 100, cuando del estudio detenido de los escritos surge que existen controversia sobre hechos esenciales. Soto v. Hotel Caribe Hilton, 137 DPR 294, 306 (1994); Véase también A. Acevedo Colom, *op. cit.*, pág. 207. Pues en un caso de tan alto interés público como es el discrimen en el empleo, "**[e]l uso del mecanismo de sentencia sumaria tiene que ser mesurado y procederá sólo cuando el tribunal quede claramente convencido de que tiene ante si de forma no**

**controvertida todos los hechos materiales pertinentes y de que, por lo tanto, una vista en los méritos resulta innecesaria**". *Íd.* (Énfasis nuestro).

### D. Determinaciones de hechos adicionales

Una persona adversamente afectada por una sentencia tiene la facultad para presentar una moción solicitando determinaciones iniciales o adicionales de hechos o conclusiones de derecho, al amparo de la Regla 43 de Procedimiento Civil, *supra*, R. 43. *SLG Szendry-Ramos v. F. Castillo*, 169 DPR 873, 879-880 (2007). La razón principal para solicitar determinaciones adicionales es que el juez sentenciador quede satisfecho de que atendió todas las controversias, a la vez que permite que los foros apelativos estén completamente informados sobre la base decisiva. *Íd., citando a* J. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Puerto Rico, Publicaciones JTS, 2000, T. I, pág. 695. La Regla 43.1 de Procedimiento Civil, *supra*, R. 43.1, dispone lo siguiente:

> No será necesario solicitar que se consignen determinaciones de hechos a los efectos de una apelación, pero a moción de parte, presentada a más tardar quince (15) días después de haberse archivado en autos copia de la notificación de la sentencia, el tribunal podrá hacer las determinaciones de hechos y conclusiones de derecho iniciales correspondientes si éstas no se hubiesen hecho por ser innecesarias, de acuerdo con la Regla 42.2, podrá enmendar o hacer determinaciones adicionales o podrá enmendar la sentencia en conformidad. Si una parte interesa presentar una moción de enmiendas o determinaciones iniciales o adicionales, reconsideración o de nuevo juicio, éstas deberán presentarse en un solo escrito y el tribunal resolverá de igual manera. En todo caso, la suficiencia de la prueba para sostener las determinaciones podrá ser suscitada posteriormente aunque la parte que formule la cuestión no las haya objetado en el tribunal inferior, no haya presentado una moción para enmendarlas o no haya solicitado sentencia.

Se ha resuelto que, de un análisis a la referida disposición, la utilización de la palabra "podrá" le imparte un carácter discrecional a la formulación de determinaciones de hechos y de derechos adicionales. *Blas v. Hosp. Guadalupe*, 146 DPR 267, 319 (1998). A pesar de que este mecanismo le brinda al tribunal sentenciador la oportunidad de enmendar cualquier error cometido y a su vez hacer

justicia, "**el tribunal de primera instancia no está obligado a hacer determinaciones de hechos y de derecho adicionales luego de ser solicitadas por una o más partes; ello de estimar que las mismas no proceden**". *Carattini v. Collazo Syst. Analysis, Inc.,* 158 DPR 345, 357 (2003) (Énfasis nuestro).

A la luz de la normativa jurídica antes expuesta, procedemos a aplicarla a los hechos de este caso.

**III.**

En el presente caso, la familia Salgado-Colón formuló dos (2) señalamientos de error. Como primer error, la parte apelante planteó que el TPI incidió al dictar sentencia sumaria en su contra y determinar que Walmart tenía justa causa para despedir a la señora Colón. Subrayó que el TPI debió concluir que la política de turnos rotativos en Walmart no era obligatoria ni constituía un requisito esencial para la continuidad de la señora Colón en el puesto de Asistente de Gerente. A saber, que se utilizó dicha política de rotar de forma arbitraria, caprichosa e inconsistente con la señora Colón. Sobre el particular, la parte apelante estableció que una empleada de la tienda Walmart de Guayama se ofreció a trabajar en el turno nocturno, por lo que no se implementó la práctica de la tienda de Santa Isabel en ceder dicho horario a los empleados que se ofrecían a rotar en el turno nocturno voluntariamente. Sostuvo que la señora Colón nunca se negó a trabajar en los otros dos (2) turnos alternativos al nocturno. Además, argumentó que durante los catorce (14) años que laboró como Asistente de Gerente nunca se le exigió rotar en el turno nocturno. Por ello, la parte apelante indicó que Walmart incurrió en una conducta contradictoria impermisible al no implementar la misma política de rotación de turnos de la tienda de Santa Isabel en Guayama.

Como segundo señalamiento de error, la parte apelante esbozó que el TPI se equivocó al denegar su solicitud de enmendar la

sentencia para añadir unas determinaciones de hechos no controvertidas que demostraban la existencia de una controversia material que impedía que el TPI resolviera el caso sumariamente. Sobre el particular, manifestó que del Foro Primario incumplió con su obligación de formular las determinaciones de hechos adicionales solicitadas por la parte apelante.

Por su parte, Walmart argumentó que la descripción del puesto de Asistente de Gerente que el manual de empleado disponía que la persona debía trabajar en el turno nocturno, por establecer lo siguiente:

**Ambiente de Trabajo**

*Es necesario trabajar en el siguiente entorno para ejecutar una o más de las funciones esenciales de este puesto:*

Trabaja durante la noche y diversos turnos, según sea necesario.

La parte apelada afirmó que, si bien era cierto que carecía de una política sobre rotación de turnos, la señora Colón tenía conocimiento de que la empresa implementó dicha política y que los Asistentes de Gerente de la tienda de Guayama debían rotar en el turno nocturno de cada doce (12) a dieciocho (18) meses. Walmart adujo que la señora Colón no había rotado en el turno nocturno en la tienda de Santa Isabel, puesto que otros empleados trabajaban voluntariamente en el referido turno por el diferencial salarial. No obstante, especificó que, desde abril de 2019, se le solicitó a la señora Colón trabajar en el turno nocturno en el Walmart de Guayama, ya que se le había exigido a los demás Asistentes de Gerente y reiteradamente se le había explicado que su puesto requería tener disponibilidad para trabajar en dicho turno. La parte apelada manifestó que excluir a la señora Colón de la rotación era muy oneroso para los demás Asistentes de Gerente y para la empresa. Precisó que no existía justificación para que la señora Colón se negara a trabajar el turno nocturno, ya que no tenía restricciones médicas

ni derecho a recibir acomodos por su edad. Ante ello, Walmart alegó que despidió a la señora Colón tras múltiples intentos por varios meses en los que se rehusó a reportarse a su turno asignado a pesar de que el propio certificado médico indicaba que podía trabajar sin restricción alguna. Añadió que la conducta de la señora Colón afectaba el ambiente de trabajo y el funcionamiento de la empresa, por lo que su acción de despedirla no fue arbitraria ni caprichosa. Puntualizó que la pretensión de la señora Colón era ser exceptuada de un requisito aplicable a todo Asistente de Gerente por su edad, más no por una incapacidad o condición médica. Por otro lado, Walmart concretó que la parte no estableció un caso *prima facie* de discrimen por edad, puesto que no evidenció que el requisito de rotación en el turno nocturno era discriminatorio por razón de edad y que la empresa tenía justa causa para despedir a la señora Colón por abandonar su empleo al negarse a trabajar en el turno que se le asignó.

Como cuestión de umbral, debemos revisar *de novo* la solicitud de sentencia sumaria instada por Walmart, así como la oposición de la familia Salgado-Colón. Luego de examinar cuidadosamente ambos documentos, así como sus anejos, concluimos que las partes cumplieron sustancialmente con la Regla 36 de Procedimiento Civil, *supra*, R. 36. Dicho esto, nos corresponde revisar si realmente en este caso existen hechos materiales en controversia. En tal ejercicio, entendemos que existen controversias de hechos materiales y esenciales que impedían disponer del caso sumariamente.

A tenor con la Regla 36.4 de Procedimiento Civil, *supra*, R. 36.4, resolvemos que los siguientes hechos esenciales y pertinentes quedaron debidamente establecidos:

1. El 11 de octubre de 1993, la señora Colón comenzó a trabajar como empleada de Walmart por un tiempo indeterminado.

2. Durante su entrenamiento como Asistente de Gerente, el 13 de febrero de 2003, la señora Colón completó la Entrevista Futuro MIT Interno. En dicho formulario se le preguntó si existía algún inconveniente o situación que le impidiera comenzar trabajando en el turno nocturno, a lo que la señora Colón respondió "ningún inconveniente con esto".

3. A la señora Colón se le proporcionó el Manual del Asociado de Walmart, que incluía las prácticas y políticas de recursos humanos para los empleados de la empresa en Puerto Rico.

4. La señora Colón participó de una reunión para repasar y discutir la política de prevención de discrimen y hostigamiento en Walmart.

5. La señora Colón reconoció que era su obligación mantenerse informada y cumplir con las reglas y políticas vigentes, nuevas y enmendadas de Walmart, las cuales eran publicadas en la red intranet WIRE.

6. La descripción del puesto Gerente Asistente establecía que: "Es necesario trabajar en el siguiente entorno para ejecutar una o más de las funciones esenciales de este puesto. Trabaja durante la noche y en diversos turnos, según sea necesario".

7. La señora Colón ocupó varios puestos en Walmart hasta ser nombrada Asistente de Gerente entre los años 2003 y 2004.

8. La señora Colón no trabajó en el turno nocturno durante el tiempo que fungió como Asistente de Gerente en la tienda Walmart de Santa Isabel.

9. La señora Colón no trabajó en el turno nocturno en la mientras fungió como Asistente de Gerente en la tienda Walmart de Santa Isabel, toda vez que existían empleados que se ofrecían voluntariamente a trabajar en el turno nocturno, lo que se hacía innecesaria la práctica de rotación.

10. En julio de 2016, la señora Colón pasó a ser Asistente de Gerente en la tienda Walmart de Guayama.

11. Al momento de la señora ser trasladada a la tienda Walmart de Guayama la Gerente de dicha tienda era la señora Sail Martínez.

12. La tienda Walmart de Guayama tenía tres (3) turnos de trabajo: el primer turno de 7:00 a.m. a 5:00 p.m., el segundo turno de 2:00 p.m. a 12:00 a.m. y el tercer turno de 10:00 p.m. a 8:00 a.m.

13. Al tercer turno de trabajo, de 10:00 p.m. a 8:00 a.m., se le conocía como el turno nocturno.

14. De acuerdo con la señora Colón, el turno nocturno estaba principalmente relacionado a supervisión.

15. En dicho turno nocturno, los Asistentes de Gerente estaban encargados de, entre otras cosas, reabastecer la tienda para que esté en óptimas condiciones para los clientes al día siguiente.

16. La tienda Walmart de Guayama tenía como práctica que los Asistentes de Gerente rotaran en el turno nocturno durante doce (12) a dieciocho (18) meses.

17. La gerente Sail Martínez, seleccionaba a los Asistentes de Gerentes que rotaban en el turno nocturno basado en el tiempo que no trabajaban en dicho turno.

18. La gerente Sail Martínez, le informaba con anticipación a los Asistentes de Gerente sobre su rotación en el turno nocturno para que pudieran realizar arreglos.

19. El 15 de abril de 2019, la gerente Sail Martínez le notificó a la señora Colón que sería asignada al turno nocturno.

20. La solicitud acomodo razonable de la señora Colón para evitar trabajar en el turno nocturno fue rechazada mediante una determinación final de la empresa con fecha de 19 de junio de 2019 y notificada el 5 de julio de 2019. Walmart le informó a la señora Colón que sus restricciones médicas le impedían cumplir con una o más funciones esenciales del puesto de Asistente de Gerente, que incluía trabajar en el turno nocturno.

21. En la determinación final del 19 de junio de 2019, Walmart le comunicó a la señora Colón que le buscaría puestos alternativos de igual o menor paga que se alinearan con sus restricciones de salud. Además, Walmart le notificó a la señora Colón que podía solicitar una transferencia para otra tienda que tuviera disponible un puesto que se adoptara a sus limitaciones.

22. El 5 de julio de 2019, la gerente Martínez le informó a la señora Colón que no tenía que reportarse al turno nocturno, ya que tenía cubierta para dicho turno, pero que en un futuro tendría que rotar en el turno nocturno al igual que los demás Asistentes de Gerente.

23. El 5 de julio de 2019, la gerente Martínez, le indicó a la señora Colón que considerara solicitar el cambio a una posición que no tuviese que rotar en el turno nocturno. La señora Colón consultó con su familia, y determinó que continuaría con el puesto de Asistente de Gerente.

24. Desde el año 2020, la tienda Walmart de Guayama comenzó a operar con tres (3) Asistentes de Gerente en el turno nocturno.

25. El 18 de julio de 2020, la gerente Martínez le informó a la señora Colón que era la próxima Asistente de Gerente que le correspondía el turno nocturno, por lo que comenzaría en dicho horario a partir del 1 de septiembre de 2020.

26. La solicitud de acomodo razonable de la señora Colón para evitar trabajar en el turno nocturno fue rechazada mediante una determinación final de la empresa con fecha de 18 de septiembre de 2020. Walmart le indicó que el puesto de Asistente de Gerente quería trabajar en el turno nocturno, así como mover, levantar, transportar y ubicar las mercancías y los suministros hasta veinticinco (25) libras sin ayuda, lo que era incompatible con la restricción médica de no trabajar durante la noche ni levantar más de diez (10) libras.

27. Posteriormente, la señora Colón se acogió a una licencia médica sin sueldo.

28. El 2 de febrero de 2021, la señora Colón proveyó un certificado médico, en el que se indicó que se encontraba apta para regresar a sus funciones sin ningún tipo de restricciones médicas.

29. El 6 de marzo de 2021, la gerente Martínez se reunión con la señora Colón para dialogar con relación cuándo podría reportarse al turno nocturno, a lo que la señora Martínez respondió que sentía que no podía trabajar en el turno nocturno por tener setenta y tres (73) años y estar sola con su esposo.

30. El 12 de marzo de 2021, la señora Colón se comunicó con la Oficina de Recursos Humanos para indicar que no puede trabajar en el turno nocturno y que puede laborar en cualquier posición cuyo turno sea hasta las 12:00 a.m., ya que no podía dejar a su esposo solo.

31. El 15 de marzo de 2021, la gerente Martínez se reunió con la señora Colón reiteró que no se reportaría a trabajar en el turno nocturno, que no iba a renunciar y que la empresa realizara lo que tuviese que hacer.

32. El 19 de marzo de 2021, Walmart le envió una carta a la señora Colón en la que le informó que no se encontraba cubierta bajo ninguna licencia y que dentro de tres (3) días a partir de recibir la carta, debía comunicarse con la gerente Martínez o con la Gerente de Recursos Humanos, la señora Luz Pérez, dado que, de lo contrario, se daría por terminado su empleo.

33. El 26 de marzo de 2021, Walmart le envió una carta a la señora Colón, en la que indicó que no se había reportado a su turno de trabajo, no se había comunicado con su supervisor ni había presentado excusa para sus ausencias, lo que se consideraba como abandono de empleo. Asimismo, le otorgó hasta el 1 de abril de 2021 para entregar cualquier documentación de excusa a la gerente Martínez o a la gerente Pérez, porque de lo contrario se daría por terminado su empleo.

34. El 31 de marzo de 2021, la señora Colón envió una carta a la gerente Pérez, en la que estableció que estaba apta para trabajar dentro de los turnos que culminan a las 12:00 p.m., pero que Walmart discriminaba en su contra al insistir que trabajara en un turno que requería estar fuera de su hogar durante la madrugada, horario que tenía que estar pendiente de cualquier emergencia que pudiese ocurrir con su esposo.

35. El 21 de abril de 2021, Walmart le envió una carta a la señora Colón, indicándole que el puesto de Asistente de Gerente requería como función esencial trabajar en el turno nocturno y que la asignación de dicho turno se realiza de forma rotativa entre los Asistentes de Gerente para cubrir dicha responsabilidad equitativamente, por lo que excusar a un Asistente de Gerente de la referida función, creaba una sobrecarga en los otros empleados.

36. En la carta del 21 de abril de 2021, Walmart le indicó a la señora Colón que carecía de información sobre las condiciones de salud de su esposo ni si las mismas cualificaban para solicitar una licencia médico-familiar bajo el *Family and Medical Leave Act*, pero que esta era inaplicable a la señora Colón por no cumplir con el

requisito de 1,250 horas trabajadas durante los 12 meses precedentes al comienzo de la licencia.

37. En la carta del 21 de abril de 2021, Walmart le ofreció a la señora Colón la alternativa de trasladarla al puesto de Cajera a tiempo parcial, con un salario de $11 por hora, ya que dicha posición no requería rotar en el turno nocturno.

38. En la carta del 21 de abril de 2021, Walmart le otorgó a la señora Colón hasta el 30 de abril de 2021 para que decidiera si se reintegraba a su puesto de Asistente de Gerente, trabajando en el turno nocturno por aproximadamente doce (12) meses, o si se trasladaba al puesto de Cajera. Se le apercibió que, de no responder a dicha comunicación, se interpretaría que no estaba dispuesta a regresar a su trabajo, por lo que la empresa procedería con su baja laboral.

39. El 20 de mayo de 2021, Walmart le indicó a la señora Colón que efectivo a dicha fecha, se terminó su relación laboral con la empresa. Esto, toda vez que le se le extendió el plazo hasta el 17 de mayo de 2021 para optar por reintegrarse a su puesto de Asistente de Gerente o aceptar el traslado al puesto de Cajera. Walmart consideró que la señora Colón abandonó su empleo al no reportarse a trabajar, no comunicarse con su supervisor, ni presentar documentación alguna para excusar su ausencia.

40. Para la fecha del despido de la señora Colón, la tienda Walmart de Guayama tenía otros nueve (9) Asistentes de Gerente que trabajaron o estaban trabajando en el turno nocturno, con excepción del señor Luis Santiago, quien abandonó la tienda poco después de la señora Colón.

No obstante, determinamos que los siguientes hechos esenciales y pertinentes están en controversia:

1. Si la rotación en el turno nocturno era uno requisito del puesto de Asistente de Gerente en las tiendas Walmart durante los años que la señora Colón ejerció dicha posición.

2. Si, durante los años que la señora Colón fungió como Asistente de Gerente, en las tiendas Walmart existió una práctica de ceder la rotación en un turno a un empleado que se ofreció voluntariamente.

3. Si existió un Asistente de Gerente en la tienda Walmart de Guayama que durante los años 2019 al 2021 se ofreció a rotar voluntariamente en el turno nocturno.

La dilucidación sobre los mencionados hechos en controversia es medular para dirimir si el despido de la señora Colón estuvo justificado. A la luz de lo anterior, concluimos que erró el TPI al disponer del caso mediante el mecanismo de sentencia sumaria, dado que existían hechos esenciales y pertinentes que ameritan ser dilucidados en un juicio plenario.

En lo atinente al segundo señalamiento de error, resolvemos que no incidió el TPI al denegar exponer determinaciones de hechos adicionales. Es imperativo recordar que, contrario a lo alegado por la parte apelante, el Foro Primario no tenía la obligación de formular determinaciones de hechos adicionales, de estimar que no procedían. Véase *Carattini v. Collazo Syst. Analysis, Inc., supra.*

**IV.**

Por los fundamentos que anteceden, se revoca el dictamen apelado. Se devuelve el caso al TPI para la continuación de los procedimientos a tenor con lo aquí resuelto.

Lo acuerda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones